[Sac. No. 7679.   In Bank.   Jan. 11, 1966.]

PHILL SILVER et al., Petitioners, v. EDMUND G. BROWN,
as Governor, etc., et al., Respondents; THE SENATE
OF THE STATE OF CALIFORNIA et al., Interveners.

[Sac. No. 7681.   In Bank.   Jan. 11, 1966.]

PHILIP ADAMS et al., Petitioners, v. EDMUND G. BROWN,
as Governor, etc., et al., Respondents; THE ASSEMBLY
OF THE STATE OF CALIFORNIA et al., Interveners.

(Consolidated Cases.)

Phill Silver, in pro. per., for Petitioners in Sac. No. 7679.

Philip Adams, Edward Napier Thomson and Roland Adickes, in pro. per., for Petitioners in Sac. No. 7681.

Thomas C. Lynch, Attorney General, Charles A. Barrett, Assistant Attorney General, and Sanford N. Gruskin, Deputy Attorney General, for Respondents in Sac. No. 7679.

Thomas C. Lynch, Attorney General, Charles A. Barrett, Assistant Attorney General, Sanford N. Gruskin, Deputy Attorney General, and Herman F. Selvin for Respondents in Sac. No. 7681.

Musick, Peeler & Garrett, Gerald G. Kelly, Richard T. Apel, William J. Emanuel, Bruce A. Bevan, Jr., Herman F. Selvin, Adrian Kuyper, County Counsel (Orange), Seymour S. Pizer, Assistant County Counsel, Woodruff J. Deem, District Attorney (Ventura), Paul L. McKaskle, Deputy District Attorney, Conrad G. Tuohey and Dannemeyer, Gustaveson & Tuohey for Interveners in Sac. No. 7679.

Phill Silver, in pro. per., Musick, Peeler & Garrett, Gerald G. Kelly, Richard T. Apel, William J. Emanuel, Adrian

Kuyper, County Counsel (Orange), Seymour S. Pizer, Assistant County Counsel, Woodruff J. Deem, District Attorney (Ventura), Paul L. McKaskle, Deputy District Attorney, Garry, Dreyfus & McTernan, Benjamin Dreyfus, Donald P. McCullum, Conrad G. Tuohey and Dannemeyer, Gustaveson & Tuohey for Interveners in Sac. No. 7681.

Edward Napier Thomson,in pro. per., Gerald N. Hill, Gabriel Solomon, and John W. Scanlon, City Attorney (Hayward), as Amici Curiae in Sac. No. 7681.

James L. Blawie, Albert Dehr and Putnam Livermore as Amici Curiae in Sac. Nos. 7679 and 7681.

TRAYNOR, C. J.—In these proceedings petitioners sought writs of mandate to secure reapportionment of both houses of the Legislature. In an opinion filed September 1, 1965 (*Silver v. Brown, ante,* p. 270 [46 Cal.Rptr. 308, 405 P.2d 132]), we held that under the decisions of the United States Supreme Court the existing apportionments of both the Senate and the Assembly were invalid and that each house should be reapportioned in time for the 1966 elections. We concluded that the Legislature should have an opportunity to enact valid reapportionment legislation, but we announced temporary plans to become effective if the Legislature failed to enact valid plans of its own. We set forth limits within which an apportionment would carry at least a strong presumption of validity under the equal protection clause and beyond which it would be seriously suspect. Those limits are that no district depart from the ideal size by more than 15 per cent and that a majority of the members of each house be elected by the voters of districts containing at least 48 per cent of the total population. We retained jurisdiction to review any reapportionment legislation that might be enacted and to order our proposed plans into effect if necessary.

On September 17, 1965, the Governor called the Legislature into extraordinary session to consider reapportionment legislation. On October 21, the Legislature passed a bill, herein referred to as Chapter 3, reapportioning the Senate and the Assembly, and on October 27 the Governor signed it. (Stats. 1965, Second Ex. Sess., ch. 3.) While the Legislature was still in session, certain technical errors were discovered in Chapter 3, and on November 3 both houses of the Legislature passed Senate Bill 13. It corrected technical errors in Chap-

ter 3, made other minor changes therein, and afforded additional pension benefits to legislators affected by reapportionment. Owing to the pension provisions of Senate Bill 13, the Governor refused to sign it, and it has not gone into effect.

On November 24, the Governor presented an application pursuant to our retained jurisdiction requesting that Chapter 3 be construed to obviate the technical errors therein and approved as so construed. The Senate and the Assembly have joined in the Governor's application. Petitioners in both cases and certain interveners oppose the Governor's application and urge various alternative dispositions.

From the legislative history and statistical data presented in support of the Governor's application, it appears that in enacting Chapter 3 the Legislature undertook to reapportion itself by creating senatorial and assembly districts composed of contiguous territory that meet the 15 per cent and 48 per cent population limits set forth in our prior opinion. That purpose also appears from the provisions of Chapter 3 considered as a whole. When, however, the maps and census tracts that the Legislature used in drafting Chapter 3 were translated into descriptive terminology, certain ambiguities and errors appeared, which, if given literal effect, would defeat the legislative purpose.

The 8th and 11th senatorial districts, which elect two senators at large, are defined as all of Alameda County not included in the 14th senatorial district. For the 8th and 11th districts to be composed of contiguous territory and meet the 15 per cent population limit, the City of Oakland must be included in the 8th and 11th districts, and it is clear that it was the Legislature's purpose so to provide. To achieve this purpose the boundary of the 14th district from its junction with the Oakland boundary must proceed easterly and northerly along the Oakland boundary to the Alameda County boundary, thereby excluding Oakland from the 14th district. Chapter 3 provides instead that the boundary of the 14th district shall proceed northwesterly along the Oakland boundary to the county boundary, thereby including Oakland in the 14th district and leaving the 8th and 11th districts composed of three noncontiguous parts.

Chapter 3 also provides that Census Tracts 50, 62, 65 and 66 in Alameda County are to be excluded from the 14th district. There are two sets of such tracts in Alameda County, however, one labeled "Oakland tracts" and one labeled "Hayward tracts." Exclusion of the Hayward tracts

results in districts composed of contiguous territory, whereas exclusion of the Oakland tracts results in districts composed of noncontiguous territory. It appears from the legislative history that the Hayward tracts are the ones the Legislature meant to exclude.

In Los Angeles County one square block at approximately the point where the 21st, 23d, 26th, and 27th senatorial districts converge is not included in any of those districts as described in Chapter 3. As a result, that block is part of a district to which it is not contiguous, the 32d, which is described as all of the county not included in other senatorial districts. That block, however, is part of Census Tract 1903, and the legislative history shows that the Legislature meant to include tract 1903 in its entirety in the 21st district.

County officials of Solano County have objected that the boundary description in Chapter 3 of the part of the 2d senatorial district in that county does not conform to the so-called official county map. From the legislative history it appears, however, that the description in Chapter 3 referred to maps entitled ''County Road System, Solano County, California, prepared by the State-Wide Highway Planning Survey, Division of Highways, Department of Public Works, in cooperation with the United States Department of Commerce, Bureau of Roads, and the County, 1953, as revised in 1962.''

Chapter 3 describes the boundaries of the 11th assembly district in the identical language used to describe that district in the 1961 apportionment. (Elec. Code, § 30201; Stats. 1961, ch. 1233.) The description includes references to supervisorial district boundaries that have been changed since 1961. From the legislative history it appears that Chapter 3 refers to the supervisorial district boundaries as they existed in 1961.

The description of the 76th assembly district in San Diego County was drafted on the erroneous assumption that University Avenue and La Mesa Boulevard in San Diego are the same street. The correct description appears from the legislative history.

■ The literal meaning of the words of a statute may be disregarded to avoid absurd results or to give effect to manifest purposes that, in the light of the statute's legislative history, appear from its provisions considered as a whole. (*Select Base Materials, Inc.* v. *Board of Equalization*, 51

Cal.2d 640, 645 [335 P.2d 672]; *Dickey* v. *Raisin Proration Zone No. 1,* 24 Cal.2d 796, 802 [151 P.2d 505, 157 A.L.R. 324]; *County of Los Angeles* v. *Frisbie,* 19 Cal.2d 634, 639 [122 P.2d 526]; *Pool* v. *Simmons,* 134 Cal. 621, 622 [66 P. 872]; *Carpy* v. *Dowdell,* 129 Cal. 244, 245 [61 P. 1126]; *California Loan etc. Co.* v. *Weis,* 118 Cal. 489, 497 [50 P. 697].) ■ The detailed legislative history of Chapter 3 does not appear in committee reports or recorded floor discussions or debates but in affidavits of legislative employees who participated in and were familiar with the drafting of the statute. In view of the peculiar problems presented by the recently-established judicial duty to enforce constitutional apportionment, we believe that we may properly rely on such affidavits in construing Chapter 3, particularly when, as in this case, both houses of the Legislature have indicated the accuracy of the data set forth in the affidavits by accepting such data as the basis for the corrective provisions of Senate Bill 13. In discussing judicial remedies for malapportionment, the United States Supreme Court pointed out that ''Remedial techniques in this new and developing area of the law will probably often differ with the circumstances of the challenged apportionment and a variety of local conditions.'' (*Reynolds* v. *Sims,* 377 U.S. 533, 585 [84 S.Ct. 1362, 12 L.Ed.2d 506].) ■ In construing legislative remedies for malapportionment enacted under the pressure of impending election deadlines, courts must also adopt flexible techniques to discharge the duty they share with legislatures to secure constitutional apportionments in conformity with decisions of the United States Supreme Court. Accordingly, we conclude that Chapter 3 may reasonably be construed to obviate the ambiguities and technical errors in its literal provisions. As so construed Chapter 3 meets the constitutional standards set forth in our prior opinion with respect to both the United States Constitution and the California Constitution.

■ There is no merit in the contention that Chapter 3 denies equal protection by providing for the election of two senators at large both in San Francisco and in the more populous part of Alameda County and for the election of single senators elsewhere. (*Fortson* v. *Dorsey,* 379 U.S. 433 [85 S.Ct. 498, 13 L.Ed.2d 401].) It is true that in the *Fortson* case the court indicated that an at-large apportionment plan might deny equal protection if designedly or otherwise it would operate to minimize or cancel out the voting

strength of racial or political elements of the voting population. (379 U.S. at p. 439.) In the present case, however, there is no evidence that the at-large elections will so operate. Although there are substantial racial, ethnic, and political minorities in the districts involved, no purpose to minimize or cancel their voting strength appears, and it is sheer speculation to assume that dividing the at-large districts into single-member districts would substantially affect the voting strength of any of the minorities involved. Indeed, even more suspect under the equal protection clause than at-large districting would be districting that concentrated minority voting strength in a single-member district for the purpose of minimizing such strength elsewhere.

There is also no merit in the contention that Chapter 3 violates sections 5 and 6 of article IV of the California Constitution by subordinating more than one of the limitations contained therein to comply with the equal protection clause. We pointed out in our prior opinion that "not all of the provisions of sections 5 and 6 can be given effect," but "some of them can be preserved if others are sacrificed." (*Ante*, at p. 280.) We stated further: "We find nothing in the California Constitution to indicate that any particular provision governing the makeup and apportionment of the Senate and the Assembly is to be preferred over any of the others. Due consideration should be given to all of them, but we believe that it is for the Legislature and the people in the exercise of the legislative power of the state vested in them by section 1 of article IV to determine which provision or provisions of sections 5 and 6 should be subordinated to comply with the equal protection clause of the United States Constitution. The makeup and apportionment of the Legislature involve peculiarly political questions that are not appropriate for this court to decide. They are far better entrusted to the collective political wisdom of the Legislature subject to the power of initiative and referendum reserved to the people. Our function under the decisions of the United States Supreme Court is to assure adherence to the requirements of the equal protection clause, not to resolve the purely political questions also inherent in legislative apportionment. [Citations.] To preserve diversity of representation, the Legislature may deem it wise to change the number of its members. It may deem it wise in some cases to provide for the election of more than one senator or assemblyman at large from a

dual or multimember district. In other cases it may deem it preferable to join part of one county to another in forming a district." (*Ibid.*)

By providing for the election of two senators at large in both San Francisco and the populous part of Alameda County, the Legislature promoted the policy expressed in section 6 in favor of county-wide representation in the Senate. It could reasonably conclude, however, that in other parts of the state, that policy was outweighed by the policy expressed in section 6 in favor of single-member districts. The latter policy would seem clearly to predominate in the case of Los Angeles County, which elects 14½ senators. In other situations, the need to cross county lines to meet population requirements could negate any benefit of county-wide representation that might be achieved by at-large districts. In any event, our only concern is the constitutionality of Chapter 3. The wisdom of the policy decisions contained therein was solely for the Legislature to determine.

Since there is no reason to believe that respondent Secretary of State and other officials charged with conducting elections will not proceed pursuant to Chapter 3 as construed herein, no purpose would be served by issuing writs of mandate in these proceedings.

For the guidance of the election officials we construe Chapter 3 as follows:

1. The word "northwesterly" in the next to the last line on page 71 of the chaptered bill is construed as "easterly and northerly."

2. The phrase "Census Tracts 50, 62, 65 and 66" appearing in line 4, page 72, of the chaptered bill is construed as "Census Tracts HA-50, HA-62, HA-65, and HA-66."

3. After the word "Drive" in the third line from the bottom of page 79 of the chaptered bill, the following description is added to include the missing block in the 21st Senatorial District: "to Franklin Avenue, westerly on Franklin Avenue to Gower Street, southerly on Gower Street," and the words "and its prolongation" in the second line from the bottom of page 79 are therefore deleted.

4. The roads, highways, sloughs, creeks, and other landmarks set forth as bounding the Solano part of the 2d Senatorial District on page 67 of the chaptered bill are construed as those roads, highways, sloughs, creeks, and other landmarks as shown on the following maps: County Road System, Solano County, California, prepared by the State-Wide

Highway Planning Survey, Division of Highways, Department of Public Works, in cooperation with the United States Department of Commerce, Bureau of Roads, and the County, 1953, as revised in 1962.

5. The word "districts" in the third line from the bottom of page 4 of the chaptered bill is construed as "districts as they existed in 1961."

6. To correct the misdescription of the 76th Assembly District, the words "University Avenue; thence southwesterly along the center lines of University Avenue and" are deleted from lines 38 and 39 of page 61 of the chaptered bill.

The alternative writs of mandate heretofore issued are discharged and the petitions for writs of mandate are denied.

McComb, J., Peters, J., Tobriner, J., Peek, J., Mosk, J., and Burke, J., concurred.